CITY of BOSTON & others *vs.* HOSPITAL TRANSPORTATION SERVICES, INC. & others.

Suffolk. March 16, 1978. — March 30, 1978.

Present: HALE, C.J., ARMSTRONG, & BROWN, JJ.

*Boston. Statute*, Construction. *Carrier*, Of passengers. *License. Words,* "Licensing authority."

A license to operate buses or limousines between Logan Airport and various municipalities west and north of Boston, issued by the Department of Public Utilities under the second paragraph of G. L. c. 159A, § 1, did not require the approval of the mayor of Boston. [199–202]

CIVIL ACTION commenced in the Superior Court on February 14, 1977.

The case was heard by *Ankeles*, J., a District Court judge sitting under statutory authority.

*William J. Smith*, Assistant Corporation Counsel, for the city of Boston.

*Richard J. Lettieri* for Massachusetts Port Authority, intervener.

*Arthur M. White* for Hospital Transportation Services, Inc. & another.

*Terry Jean Seligmann*, Assistant Attorney General, for the Department of Public Utilities, intervener.

ARMSTRONG, J. The plaintiffs, who include, in addition to the city of Boston, fifteen taxicab drivers licensed by the city, brought this action to enjoin the two original defendants from operating buses or limousines between Logan International Airport and various municipalities west and north of Boston. The licenses under which the defendants conducted their bus services had been issued by the Department of Public Utilities, which moved to

and was allowed to intervene in the action to defend the validity of the licenses. Also intervening, for the same purpose, was the Massachusetts Port Authority, which operates the airport. A District Court judge sitting in the Superior Court by designation ruled that the licenses were valid and dismissed the action.

The sole contention raised by the plaintiffs on appeal is that the approval of the mayor of the city of Boston is a prerequisite to the validity of the licenses in question and that the mayor's approval has been neither sought nor given. The defendants maintain that a license issued, as these were, under the second paragraph of G. L. c. 159A, § 1 (the second paragraph having been added to that section by St. 1975, c. 740), does not require submission to or approval by the mayor.

The contentions of the parties may be understood by comparing the relevant portions of three licensing statutes in order of passage. The first paragraph of G. L. c. 159A, § 1, was in effect for many years prior to 1975. It provides that "[n]o person shall ... operate ... [a bus service] in any city or town ... without first obtaining a license for such operation from the city council of such city or the selectmen of such town, in this chapter called the licensing authority.... Any such license issued by a city council under this section shall be subject to the approval of the mayor...."

In June, 1975, the Legislature passed a special act (St. 1975, c. 306) which provided that, "[n]otwithstanding any provisions of [G. L. c. 159A] ... the department of public utilities may, with the approval of the mayor of the city of Boston, issue licenses for the operation" of bus or limousine services such as those conducted by the defendants.

In December, by St. 1975, c. 740, the Legislature added to G. L. c. 159A, § 1, the second paragraph, which again provided for the issuance of licenses by resort to the Department of Public Utilities but in a manner which left not wholly certain whether mayoral approval of such a

license was still required. The second paragraph reads, in part: "If any application for a license under this section is not favorably acted upon within a period of sixty days after the filing thereof, the applicant may appeal to the department of public utilities within five days following the expiration of said period. . . . If the [department's] commission approves the action of the licensing authority, it shall issue notice to that effect, but if the commission disapproves of said action, it shall act as a licensing authority and may issue a license . . . ."

The argument of the plaintiffs focuses principally on the two references to "licensing authority" in the sentence last quoted — a term which, they contend, has been defined in the first paragraph of § 1 to mean, in the case of a city, the city council. As applied to a city, they would paraphrase the sentence in question: "If the commission approves the action of the city council, it shall issue notice to that effect, but if the commission disapproves of said action, it shall act as the city council and may issue a license." In other words, they read the second paragraph as authorizing the department to step into the shoes of the city council and to substitute its judgment for that of the city council, but not to obviate the other requirement of paragraph one, namely, approval by the mayor.

The plaintiffs' position is plausible, but we think that a careful weighing of all considerations, both of the language employed and the sense of the section in the light of what the Legislature was apparently intending to accomplish, favors the contrary conclusion reached by the trial judge. In the first place, looking at the words of the section literally, the plaintiffs encounter a problem in that the sentence of the first paragraph which is the sole source of the requirement of mayoral approval reads, "Any such license *issued by a city council* . . . shall be subject to the approval of the mayor" (emphasis supplied). The licenses in question were not issued by the city council, but rather by the Department of Public Utilities,

and thus do not fall within the literal scope of the sentence. That fact would not be conclusive if it were clear from the section read as a whole that a contrary result was intended by the Legislature, but we are unable to find any such clear, contrary implication.

Looking at the question another way, the second paragraph of § 1 authorizes resort to the Department of Public Utilities not when a "licensing authority" fails to act favorably on a license application, but rather when "any application for a license . . . is not favorably acted upon within a period of sixty days," without specifying whose approval has been withheld. Where, as in the case of a city, favorable action requires the approval of two separate entities (i.e., the city council and the mayor), the second paragraph seems intended to provide for an appeal to the department unless both have approved the license application within the specified time. It would be an unusual use of language to say that a license has been "favorably acted upon" if it has in fact been disapproved by an officer whose approval is a prerequisite to issuance. Giving the words their natural meaning, we conclude that an appeal to the department is authorized not only in a situation where the city council has disapproved or (as in this case) withheld approval of an application but also in a situation where the city council has approved the application but the mayor has not. Such an appeal would obviously be futile if the issuance of a license by the Department of Public Utilities did not obviate the need for mayoral approval.

More generally, it must be regarded as exceptional, rather than usual, for a municipal officer to be given authority to veto a license issued by the Commonwealth or an officer or agency thereof. If such an authority were intended, we should expect the Legislature to state it expressly, as they did in St. 1975, c. 306, and not leave it to implication. Finally, St. 1975, c. 740, was remedial legislation, and any ambiguities therein should, in accordance with the usual rule of construction, be resolved

so as to accomplish more fully the remedial purpose which prompted its passage. The construction adopted below was in accordance with those principles.

*Judgment affirmed.*